IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL A. McCORD, | No. C 05-00184 JW (PR) |
| Petitioner, | ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS |
| vs. | |
| W.A. DUNCAN, Warden, | |
| Respondent. | |

Petitioner, a state prisoner currently incarcerated at the High Desert State Prison in Susanville, California, has filed a pro se petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his state conviction. The Court reviewed the petition and ordered respondent to show cause why a writ of habeas corpus should not be granted based on petitioner's three claims. Respondent filed an answer with a supporting memorandum and exhibits. Petitioner filed a traverse.

**BACKGROUND**

According to the petition, petitioner plead guilty to forcible rape in Santa Clara County Superior Court. The trial court found true allegations that petitioner had five prior felony convictions and sentenced him to twenty-five years to life in state prison under

California's "Three Strikes" law. On direct appeal, the California Court of Appeals affirmed, and the California Supreme Court denied a petition for review. Thereafter, petitioner filed an unsuccessful habeas petition in the California Supreme Court.

The California Court of Appeals set forth the following summary of facts[1]:

*I.     Incident Facts[2]*

> While walking to work at approximately 7:15 a.m. on September 8, 1995, B.B. (Victim) was grabbed from behind by a man who was later identified through DNA analysis as [petitioner]. [Petitioner] put his hands over Victim's mouth, face, and eyes and pulled her into the bushes next to a commercial building. [Petitioner] told Victim he had a knife and threatened to kill her. [Petitioner] struck Victim on the right side of the face with a hard, metal object.
>
> [Petitioner] then forced Victim onto the ground face down. He removed her skirt and panties, and attempted to have intercourse with her from the rear. When this did not work, [petitioner] told Victim to roll over onto her back. Victim rolled over and started to struggle and scream. [Petitioner] responded by choking Victim to the point where she almost lost consciousness. [Petitioner] told Victim that if she did not stop struggling, he would kill her. Victim stopped resisting. [Petitioner] then inserted his penis into Victim's vagina.
>
> After the rape, [petitioner] asked Victim whether she had any money and rummaged through her purse. Victim later determined that some coins were missing from her purse. [Petitioner] told Victim to count to 100 as he fled the scene.
>
> Police investigators found a metal wrench and some footprints at the scene. The investigators were unable to develop any fingerprint evidence from the wrench. The officers transported Victim from the scene of the incident to Santa Clara Valley Medical Center, where she was examined for evidence of a sexual assault. Evidence collected at that time included vaginal swabs, vaginal smears, and Victim's clothing, including her skirt. A few days later, Victim provided the investigators with a sample of her blood.
>
> Victim's glasses were knocked off of her face in the attack and she did not get a good look at her assailant's face. The only description Victim could give of her assailant was that he was black, between 20 and 30 years old, possibly stocky, and of medium height. At the time of the rape, Victim was 58 years old and unmarried.

*II.    Forensic Testing and DNA Analysis*

> The evidence collected during Victim's sexual assault examination and

---

[1] People v. McCord, No. E9909863, slip op. at 2-9 (Dec. 3, 2003) (Resp't Ex. C).

[2] The incident facts are taken from the testimony of Officer David Pitts at the preliminary hearing. At trial, the parties stipulated that the preliminary hearing transcript, which included the testimony of Officer Pitts, could come into evidence.

| | |
|---|---|
| 1 | Victim's reference blood sample were submitted to the Santa Clara County |
| 2 | Crime Lab (SCCCL) for analysis. During the initial testing, the lab determined that semen was present in the vaginal smears and the vaginal swabs. Next, the |
| 3 | lab extracted DNA from the semen on one of the vaginal swabs and Victim's blood sample. The extracted DNA was then tested. |

*A.     Background Information Regarding DNA Testing*

The basic science behind identification by DNA profile has been explained at length in several published opinions. (See People v. Soto (1999) 21 Cal.4th 512, 519-525, 981 P.2d 958 (Soto); People v. Barney (1992) 8 Cal.App.4th 798, 805-810 (Barney); People v. Brown (2001) 91 Cal.App.4th 623, 627-629.)  The DNA evidence in this case was subjected to four different types of DNA testing: DQ alpha analysis, D1S80 testing, restriction fragment length polymorphism (RFLP) analysis, and short tandem repeat (STR) testing with a testing kit known as Profiler Plus. Although [petitioner]'s appeal relates to the testing done with Profiler Plus, we shall briefly review some of the science behind DNA testing, as an aid to our review of the issues related to the testing done with Profiler Plus.

DNA is found in virtually every one of the trillions of cells in the human body, except red blood cells. A DNA molecule is shaped like a spiral staircase. It consists of two parallel spiral-shaped strands that are connected by a series of rungs, which constitute the steps in the staircase. Each rung consists of a pair of chemical components called bases. (Soto, supra, 21 Cal.4th at p. 520.)

"'A person's individual genetic traits are determined by the sequence of base pairs in his or her DNA molecules. That sequence is the same in each molecule regardless of its source (e.g., hair, skin, blood, or semen) and is unique to the individual. Except for identical twins, no two human beings have identical sequences of all base pairs. [P] In most portions of DNA, the sequence of base pairs is the same for everyone. Those portions are responsible for shared traits such as arms and legs. In certain regions, however, the sequence of base pairs varies from person to person, resulting in individual traits. A region-or locus-that is variable is said to be polymorphic.' [Citation.]" (Soto, supra, 21 Cal.4th at p. 520 quoting Barney, supra, 8 Cal.App.4th at pp. 805-806.) In order to establish a person's DNA profile, scientists look at identified loci or "markers" in those portions of the DNA where people tend to be different.

DNA testing methods, including those used at the SCCCL, have evolved over time. California courts have recognized that two methodologies are widely used in forensic DNA testing: restriction fragment length polymorphism (RFLP) analysis, a technique that analyzes DNA without copying it, and polymerase chain reaction (PCR) testing, a technique that involves amplifying or copying the DNA. (People v. Hill (2001) 89 Cal.App.4th 48, 57(Hill)[.])

There are several subtypes of PCR testing. (Hill, supra, 89 Cal.App.4th at p. 57.) The various PCR tests differ in the number of genetic markers tested and the methods used to identify the targeted gene and record the test results. (Id. at pp. 57-58.) Three PCR tests were used in this case: DQ alpha, D1S80, and Profiler Plus.

PCR analysis and DQ alpha testing were described in People v. Morganti (1996) 43 Cal.App.4th 643, 662 (Morganti) as follows: "PCR is 'a

molecular biology technical procedure for exploiting genetic differences in DNA,' whereby small pieces of DNA are copied or amplified. The technique is employed when the DNA sample available is too small and/or degraded to perform a more common type of DNA analysis known as RFLP. [P] The PCR analysis performed in this case was used to amplify a specific gene known as the DQ alpha. The DQ alpha gene codes for proteins found on the surface of the white blood cell and is known to have alternate genetic forms, i.e., the gene does not look the same in all people. Six variations (or alleles) have been identified and labeled as 1.1, 1.2, 1.3, 2, 3 and 4. Because alleles are inherited in pairs, one from each parent, there are twenty-one possible combinations which are referred to as genotypes."

"In the forensic setting, PCR analysis of DQ alpha involves three general steps. First, DNA is extracted from the nucleus of cells present in [a forensic sample]. Second, the DQ alpha is replicated or amplified by a process which involves combining the DNA with a commercially available solution or 'cocktail' and then subjecting the solution to a series of controlled temperature cycles. Finally, the amplified gene is typed in order to identify the alleles present in the amplified DNA." (Morganti, supra, 43 Cal.App. 4th at p. 662, fn. omitted.) The Morganti court concluded that PCR analysis of the DQ alpha gene is generally accepted in the relevant scientific community. (Id. at pp. 664, 671.)

Lisa Brewer, senior criminalist for the SCCCL testified on behalf of the prosecution. Brewer testified that DNA testing is typically done on a reference sample to develop a profile. The criminalist then checks the profile on the reference sample against profiles obtained from the evidence to see if there is a match or an exclusion. An exclusion means that the person could not have left the sample in question. Depending on how many markers match, an inclusion means the person tested either left the sample or can be included as a possible donor. Where there is an inclusion, the next step in the analysis is to determine the frequency of the profile in various population groups.

PCR testing has been around since the mid-1980's. The SCCCL has been using PCR-based technology since 1991. PCR testing at the SCCCL has evolved over the years, as the technology has evolved. The lab started by testing the DQ alpha marker, then added the D1S80 marker. Both tests analyze single markers at different loci of DNA. DQ alpha testing has only 21 different types, so it is not very discriminating. D1S80 has 500 types, so it is more discriminating than DQ alpha. The SCCCL eventually began performing STR testing with the Profiler Plus and CoFiler test kits that, when combined, test 13 different loci and do gender typing. The results of STR testing are highly discriminating. For example, in a nine-marker profile, the criminalist will typically see numbers like one in a billion or one in a trillion to describe the frequency of the occurrence of a particular profile in the population.

*B.      Initial DNA Testing on Samples from Victim*

The initial DNA testing in this case was done in September 1995 using the DQ alpha system. According to the criminalist's report, the DNA that was extracted from the vaginal swab was divided into two parts: a sperm cell fraction, which contained DNA from Victim's assailant, and an epithelial cell fraction, which was composed of epithelial cells from Victim. The sperm cell fraction was determined to be a DQ alpha type 1.1, 4, which occurs in 8.9 percent of the African-American population. In its report, the SCCCL offered

to do additional testing upon receipt of a reference sample from a suspect.

C.  *DNA Testing on Samples from Suspects Other Than [Petitioner]*

Between October 1995 and January 1996, police investigators asked the SCCCL to do DQ alpha testing on reference blood samples extracted from five different suspects. As a result of that testing, all five suspects were excluded as possible sources of the semen in the samples.

In mid-January 1996, police investigators asked the SCCCL to do DQ alpha testing on a reference blood sample from Romel Reid to determine whether he was the source of the semen on Victim's vaginal swab. Reid had been charged with committing a series of offenses against 15 other female victims that occurred around the time of the rape in this case. The charges against Reid included forcible rape, assault with intent to commit rape, robbery, and other crimes. The case received extensive media attention in which Reid was dubbed the " 'Peninsula rapist.' " (Reid v. Superior Court (1997) 55 Cal.App.4th 1326, 1329.) The testing on Reid's blood sample resulted in a "1.1,4" DQ alpha profile, which matched the sperm cell fraction of the DNA on Victim's vaginal swab. The criminalist concluded, "Romel Reid cannot be eliminated as a possible semen donor."

In October 1996, police investigators asked the SCCCL to do D1S80 testing on the reference blood samples from Victim and Reid and on the semen on the vaginal swab. They also asked the lab to examine Victim's clothing for the presence of semen and perform genetic testing on any samples located on the clothing. The criminalist discovered a large semen stain on the back of Victim's skirt. DNA was extracted from the semen on the skirt and tested along with the other samples. As a result of the D1S80 testing, which is more discriminating than DQ alpha, Reid was excluded as a possible source of the semen on the skirt and the vaginal swab.

The SCCCL sent the samples to the California Department of Justice (DOJ) crime lab to perform RFLP testing to confirm the exclusion. The DOJ crime lab reported an exclusion of Reid based upon RFLP testing.

D.  *DNA Testing on Samples from Victim, [Petitioner], and Reid Using Profiler Plus*

The DOJ lab submitted the RFLP profile it had prepared of the crime scene evidence to a computerized database that contains DNA information on felons in state prison and got a "cold hit," a match between [petitioner]'s RFLP profile and the RFLP profile of the crime scene evidence. 4 At the time, [petitioner] was incarcerated in Soledad State Prison serving a 27-years-to-life sentence for auto theft (Veh. Code, § 10851, subd. (a)), plus enhancements ( § 667.5, subd. (b)), pursuant to the Three Strikes law.

After obtaining the database match, police investigators obtained a blood sample from [petitioner] pursuant to a search warrant. In the latter part of 1998, the investigators submitted [petitioner]'s blood sample, Victim's blood sample, Reid's blood sample, Victim's vaginal swabs, and Victim's skirt to the SCCCL for additional DNA testing. The lab tested all of the samples using Profiler Plus and did D1S80 testing on [petitioner]'s blood sample.

After completing this round of testing, the lab once again excluded Reid

1 as a possible source of the semen on the swab and the skirt. The lab concluded that [petitioner] "cannot be eliminated as a possible source of the semen on the vaginal swab... and skirt...." Based on the combination of the nine Profiler Plus loci and the single D1S80 locus detected in the testing, the lab calculated the probability of a random match between the crime scene samples and [petitioner]'s profile as one in 13 trillion for African-Americans, one in 97 quadrillion for Caucasians, and one in 1.8 quadrillion for Hispanics. As to the significance of these numbers, Brewer stated that if you looked at everyone in the world 10 times over, you would only find one person that would match.

## DISCUSSION

A. Standard of Review

This court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

The writ may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Id. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13 (2000). "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. "[A] federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state

1 court's application of clearly established federal law was "objectively unreasonable." Id. at
2 409.

3 The only definitive source of clearly established federal law under 28 U.S.C. §
4 2254(d) is in the holdings (as opposed to the dicta) of the Supreme Court as of the time of the
5 state court decision. Williams, 529 U.S. at 412; Clark v. Murphy, 331 F.3d 1062, 1069 (9th
6 Cir. 2003). While circuit law may be "persuasive authority" for purposes of determining
7 whether a state court decision is an unreasonable application of Supreme Court precedent,
8 only the Supreme Court's holdings are binding on the state courts and only those holdings
9 need be "reasonably" applied. Id.

10 Even if the state court decision was either contrary to or an unreasonable application
11 of clearly established federal law, within the meaning of AEDPA, habeas relief is still only
12 warranted if the constitutional error at issue had a "'substantial and injurious effect or
13 influence in determining the jury's verdict.'" Penry v. Johnson, 532 U.S. 782, 796 (2001)
14 (quoting Brecht v. Abrahamson, 507 U.S. 619, 638 (1993)).

15 Lastly, a federal habeas court may grant the writ it if concludes that the state court's
16 adjudication of the claim "resulted in a decision that was based on an unreasonable
17 determination of the facts in light of the evidence presented in the State court proceeding." 28
18 U.S.C. § 2254(d)(2). The court must presume correct any determination of a factual issue
19 made by a state court unless the petitioner rebuts the presumption of correctness by clear and
20 convincing evidence. Id. §2254(e)(1).

21 B.    Legal Claims and Analysis

22 Petitioner raises three claims for federal habeas relief: (1) the trial court erred when it
23 denied petitioner's request for a full Kelly-Frye hearing on the admissibility of the Profiler
24 Plus DNA test; (2) "[t]he [trial] court erred in concluding a first prong Kelly hearing was not
25 required as to the 'problem of the mix sample' in forensic setting"; and (3) the trial court
26 erred in excluding third party culpability evidence. Petitioner's first two claims are based on
27 People v. Kelly, 17 Cal.3d 24 (1976), and Frye v. United States, 293 Fed. 1013 (D.C. Cir.
28 1923). (Pet. at 6.) Because claims 1 and 2 are related, the Court will address these claims

Order Denying Petition for Writ of Habeas Corpus
P:\PRO-SE\SJ.JW\HC.05\McCord184_denyHC.wpd         7

together.

1. <u>Kelly Claims</u>

Petitioner claims that the trial court erred in admitting DNA evidence obtained from Profiler Plus DNA testing and that such testing required a first prong <u>Kelly</u> hearing as it was not generally accepted by the scientific community. (Pet. at 6; <u>see also</u> Resp't Ex. D at 7, 30 (Appellant's Opening Br.).) Specifically, petitioner contends that the state court incorrectly concluded that Profiler Plus was not a new scientific technology, but rather one that is based on PCR and STR testing, which are generally accepted by the scientific community; the scientific community is divided regarding the reliability and general acceptance of Profiler Plus; and the use of Profiler Plus was problematic in cases involving mixed samples. (Resp't Ex. D at 30-31, 35.)

Admission of evidence is not subject to federal habeas review unless a specific constitutional guarantee is violated or the error is of such magnitude that the result is a denial of the fundamentally fair trial guaranteed by due process. <u>See</u> <u>Henry v. Kernan</u>, 197 F.3d 1021, 1031 (9th Cir. 1999). Failure to comply with state rules of evidence is neither a necessary nor a sufficient basis for granting federal habeas relief on due process grounds. <u>See</u> <u>id.</u> at 1031; <u>Jammal v. Van de Kamp</u>, 926 F.2d 918, 919 (9th Cir. 1991). Only if there are no permissible inferences that the jury may draw from the evidence can its admission violate due process. <u>See</u> <u>id.</u> at 920; <u>see, e.g.</u>, <u>Brown v. Farwell</u>, 525 F.3d 787, 795-97 (9th Cir. 2008) (erroneous admission of inaccurate and unreliable testimony on DNA evidence, *i.e.,* that defendant was 99.99967 percent likely to be guilty based on scientifically flawed DNA analysis, was prejudicial and violated due process given the weakness of the remaining evidence against defendant), <u>cert. granted sub nom.</u> <u>McDaniel v. Brown</u>, 129 S. Ct. 1038 (2009).

Petitioner has failed to show that the admission of the DNA evidence in his case was a error of such magnitude that it violated his due process right to a fair trial. Three different PCR DNA testing methods were used in this case, none of which eliminated petitioner as a suspect. (Resp't Ex. C at 31.) Profiler Plus was the most discriminating DNA test used. (<u>Id.</u>

at 6.) It determined that "the probability of a random match between the crime scene samples and [petitioner's] profile as one in 13 trillion for African-Americans, one in 97 quadrillion for Caucasians, and one in 1.8 quadrillion for Hispanics." (Id. at 9.) The reliability of Profiler Plus has been demonstrated in numerous scientific studies and is accepted by a significant majority of scientists who specialize in DNA testing. (Id. at 21.) Here, the Profiler Plus test results were corroborated by two other DNA tests. (Id. at 8.) Therefore, it cannot be said that there were no permissible inferences that the jury could draw from the Profiler Plus DNA results so as to violate due process. See Jammal, 926 F.2d at 920.

Accordingly, the state court's decision rejecting petitioner's Kelly claims were not contrary to, or an unreasonable application of, clearly established federal law, nor was it an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d)(1), (2). Petitioner is not entitled to habeas relief on these claims.

2. Third Party Culpability Evidence

Petitioner claims that the trial court erred in denying his pretrial discovery motion to obtain evidence on the nine sex crimes committed by Romel Reid and that this evidence tended to show that Reid, not petitioner was the perpetrator. (Resp't Ex. D at 50.) Petitioner argues that the evidence tended to show that Reid's modus operandi was similar to the one used against victim; that Reid was found in the vicinity a few days before the crime; and that Reid admitted to assaulting and robbing a woman in the same area. (Id.)

"State and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials." Holmes v. South Carolina, 547 U.S. 319, 324 (2006) (quotations and citations omitted). This latitude is limited, however, by a defendant's constitutional rights to due process and to present a defense, rights originating in the Sixth and Fourteenth Amendments. See id. "While the Constitution prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote, well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury." Id. at 325-26;

Order Denying Petition for Writ of Habeas Corpus
P:\PRO-SE\SJ.JW\HC.05\McCord184_denyHC.wpd             9

see also Montana v. Egelhoff, 518 U.S. 37, 42 (1996).

Under California law, third party culpability evidence is inadmissible "if it simply affords a possible ground of suspicion against [another] person; rather, it must be coupled with substantial evidence tending to directly connect that person with the actual commission of the offense." Perry v. Rushen, 713 F.2d 1447, 1449 (9th Cir. 1983) (quoting People v. Green, 27 Cal.3d 1, 22 (1980)). The Ninth Circuit weighed the defendant's "undeniably strong" interest in presenting third party evidence against the state's "compelling" interest in "reliable and efficient trials" and held that the law is constitutional. Perry, 713 F.2d at 1451, 1455. Even if third-party culpability evidence "is not actually irrelevant," the court does not violate a defendant's Sixth and Fourteenth Amendment rights when it prohibits evidence that "is sufficiently collateral and lacking in probity on the issue of identity...." Id.

The state appellate court applied the above state standard for third-party culpability evidence and found that the evidence of Romel Reid was properly excluded:

> A criminal defendant has a right to present evidence of third party culpability if it is capable of raising a reasonable doubt about the defendant's own guilt. (People v. Hall (1986) 41 Cal.3d 826, 833, 226 Cal. Rptr. 112, 718 P.2d 99 (Hall).) "'Evidence of the culpability of a third party offered by a defendant to demonstrate that a reasonable doubt exists concerning his or her guilt, must link the third person either directly or circumstantially to the actual perpetration of the crime. In assessing an offer of proof relating to such evidence, the court must decide whether the evidence could raise a reasonable doubt as to defendant's guilt and whether it is substantially more prejudicial than probative under Evidence Code section 352. [Citations.]' [Citations.]" (People v. Cunningham (2001) 25 Cal.4th 926, 996.) Evidence of a third party's motive or opportunity to commit the crime alone is not enough to raise a reasonable doubt about the defendant's guilt... [citations omitted]
>
> We review a trial court's decision to exclude evidence under Evidence Code section 352, including evidence of third party culpability, under an abuse of discretion standard. (People v. Cudjo (1993) 6 Cal.4th 585, 609, 863 P.2d 635.) ...
>
> The defendant in Johnson was charged with four counts of burglary and one count of robbery. As part of his defense, the defendant offered evidence that another person had been detained on suspicion of committing one of the burglaries. That suspect had been seen walking away from the house where the burglary occurred, carrying a bag of groceries and almost $200 in cash. (Johnson, supra, 200 Cal. App. 3d at pp. 1559-1560.) Based on fingerprint evidence that was left at the scene of the burglary, the third party was eventually eliminated as a suspect. The trial court excluded evidence regarding the third party, stating that the fingerprint evidence was "'too strong' to overcome." (Id. at p. 1564.) The court also stated that but for the exclusion

|   |   |
|---|---|
| 1 | based on the fingerprint evidence, the evidence would have been admitted. (<u>Ibid.</u>) |
| 2 | |
| 3 | The defendant in <u>Johnson</u> challenged the court's ruling as an improper incursion into the jury's function, arguing that it was for the jury to determine the credibility of the evidence. The Court of Appeal disagreed, explaining: "We agree that the trial court may not invade the province of the jury by making credibility determinations about the proffered evidence. However, we interpret the trial judge's words to imply that when the circumstantial evidence that caused the police to suspect this third person of involvement in the... burglary and the uncontradicted fingerprint evidence that developed later was considered, the totality of the evidence did not rise to the level necessary to create a reasonable doubt about Johnson's guilt. [P]... Even the strongest circumstantial evidence case of third party culpability does not raise a reasonable doubt about a defendant's guilt when fingerprints found at the scene of the crime could not have been those of the third party. This conclusion does not require any credibility determination; Johnson's evidence is deemed to be credible for purposes of this motion, as is the prosecutor's uncontradicted evidence that the third party was eliminated as a burglary suspect after fingerprint comparison. Simply put, Johnson's evidence raised a possibility that the prosecution's evidence made an impossibility. As his proffered evidence could not logically raise a reasonable doubt about his guilt, the trial court properly excluded it." (<u>Johnson</u>, supra, 200 Cal. App. 3d at p. 1564.) |

We find the reasoning in <u>Johnson</u> persuasive and controlling in this case. There was no issue regarding the credibility of the first two DNA tests that excluded Reid as a suspect. [Petitioner]'s third party evidence raised a possibility that the DNA evidence made impossible. Since the third party evidence could not logically raise a reasonable doubt about defendant's guilt, it was properly excluded.

(Resp't Ex. C at 31-33.)

The state court's decision was not unreasonable. It evaluated petitioner's claim using a California evidentiary standard that was approved by the Ninth Circuit. See <u>Perry</u>, 713 F.2d 1447. In addition, it reasonably concluded that DNA evidence strongly pointed to petitioner as the assailant and that third-party culpability evidence would not have cast "reasonable doubt" about his guilt.

Three different DNA tests (DQ alpha, D1S80, and Profiler Plus) eliminated Reid as the perpetrator. (Resp't Ex. C at 31, n.13.) The only DNA test that did not eliminate him was the DQ alpha test. (<u>Id.</u> at 7.) However, this is not surprising since the DQ alpha test provided the least discriminating results. DQ alpha testing compares only 21 markers between the DNA sample left at the crime scene and the suspect's DNA sample, whereas D1S80 testing compares 500 markers, and Profiler Plus allows the criminalist to "typically

Order Denying Petition for Writ of Habeas Corpus
P:\PRO-SE\SJ.JW\HC.05\McCord184_denyHC.wpd         11

see numbers like one in a billion or one in a trillion to describe the frequency of the occurrence of a particular profile in the population." (Id. at 6.)

The more discriminating tests resulted in eliminating Reid as the possible source of the semen on the vaginal swab and skirt, but not petitioner. (Id. at 8.) Profiler Plus analysis concluded that the probability that any other person would have petitioner's DNA profile was at most 1 in 13 trillion. (Id. at 9.) The reliability of Profiler Plus has been established in numerous scientific studies and cannot reasonably be questioned. (Id. at 15-27.)

Because DNA evidence exculpates Reid, petitioner's only remaining argument is that the evidence should have been admitted because Reid's modus operandi is sufficiently similar to the perpetrator of the crime: "the modus operandi of the crimes was sufficiently similar as to almost constitute a signature, including mode of attack (from behind), the nature of the sex acts (penetration from the rear), the use or threatened use of a weapon, and telling the victim to 'count to one hundred' after the crime." (Resp't Ex. D at 53.) The Ninth Circuit rejected a similar argument in Perry, 713 F.2d at 1455, because "the evidence offered by [the defendant] did nothing to impugn the strong identification of [him] as the assailant." Here, given the highly suggestive DNA evidence inculpating petitioner, it is unlikely that admission of evidence regarding Reid's sex crimes would have cast any doubt on petitioner's guilt with respect to this particular victim.

Accordingly, the state court's rejection of this claim was not contrary to, or an unreasonable application of, clearly established federal law, nor was it an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d)(1), (2). Petitioner is not entitled to habeas relief on this claim.

## CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is DENIED.

DATED: January 8, 2010

JAMES WARE
United States District Judge

Order Denying Petition for Writ of Habeas Corpus
P:\PRO-SE\SJ.JW\HC.05\McCord184_denyHC.wpd       12

UNITED STATES DISTRICT COURT

FOR THE

NORTHERN DISTRICT OF CALIFORNIA

MICHAEL A. MCCORD,

        Petitioner,

  v.

W. A. DUNCAN, Warden,

        Respondent.

Case Number: CV05-00184 JW

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on 1/15/2010, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Michael Anthony McCord D-12013
California State Prison - Sac
P. O. Box 29-0066
Represa, CA 95671-0066

Dated: 1/15/2010

Richard W. Wieking, Clerk
/s/ By: Elizabeth Garcia, Deputy Clerk